IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>v.<br><br>**ARONTE YEPHET KERNEY, JR.**,<br><br>Defendant. | Case No. 3:24-cr-246-SI<br><br>**ORDER ON MOTION TO SUPPRESS EVIDENCE** |

**Michael H. Simon, District Judge.**

A federal grand jury indicted Defendant Aronte Yaphet Kerney, Jr. and charged him with one count of felon in possession of a firearm and one count of felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1). ECF 1. Now before the Court is Defendant's Motion to Suppress Evidence. ECF 22. The Court held an evidentiary hearing on December 18, 2025. For the reasons stated below, the Court denies Defendant's motion to suppress.

**STANDARDS**

The Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures by the government. U.S. Const. amend. IV. "A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way

restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (cleaned up). A person's liberty is restrained "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 545 (1980). A seizure is "'*per se* unreasonable under the Fourth Amendment'" when officers do not have a warrant. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). That general rule, however, is subject to "'a few specifically established and well-delineated exceptions.'" *Id.* (quoting same). The government bears the burden of proving that a warrantless seizure falls within an exception such that it does not violate the Fourth Amendment. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

One exception to the warrant requirement is a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 17-18 (1968). A *Terry* stop is "a brief, investigative stop of an individual" that police officers may perform "when they have reasonable suspicion that the 'person apprehended is committing or has committed a criminal offense.'" *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

To form reasonable suspicion, an officer must have a "'particularized and objective basis' for suspecting criminal wrongdoing." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "An officer cannot rely only upon generalizations that 'would cast suspicion on large segments of the law-abiding population.' 'Seemingly innocuous behavior,' unless combined with other circumstances indicating criminality, does not justify a *Terry* stop." *Id.* (quoting *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006)). "A determination that reasonable suspicion exists," however, "need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277 (discussing reasonable suspicion in the context of an investigatory stop of a vehicle).

PAGE 2 – ORDER ON MOTION TO SUPPRESS EVIDENCE

A district court must consider "the totality of the circumstances—the whole picture" in assessing whether reasonable suspicion exists. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Even when justified by reasonable suspicion, a *Terry* stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Terry*, 392 U.S. at 19 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." (quotation marks omitted)). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500. The stop may also include a "brief pat-down (or frisk)" if the officer "reasonably believes that the persons with whom he or she is dealing may be armed and presently dangerous." *United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021) (cleaned up). That test "is an objective one: whether a reasonably prudent officer in the circumstances would be warranted in the belief that his or her safety or that of others was in danger." *Id.* (cleaned up); *see also United States v. I.E.V.*, 705 F.3d 430, 434-35 (9th Cir. 2012).

When evidence is gathered in a search and seizure that violates the Fourth Amendment, the exclusionary rule generally prevents its use in a criminal trial brought against the victim of the unlawful search. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987). In *Nix v. Williams*, however, the Supreme Court held that evidence obtained in violation of the Constitution could still be admitted at trial if the government could prove "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." 467 U.S. 431, 444 (1984).

## BACKGROUND

At about 9:00 a.m. on the morning of January 2, 2024, three female, Black teenagers assaulted and robbed a woman in Springfield, Oregon. ECF 23-1 at 47. The juveniles jumped the

PAGE 3 – ORDER ON MOTION TO SUPPRESS EVIDENCE

victim and stole her vehicle, cell phone, and wallet. *Id.* After the attack, the victim had a bloody fat lip, pain to her head, a skinned knee, and a limp. *Id.* By the time Springfield Police Officer Bragg arrived at the scene, the juveniles had already fled. *Id.*

At about 10:30 a.m., the victim sent a text message to Officer Bragg, telling him that her sister had a "live location" of the victim's stolen cell phone. *Id.* Officer Bragg drove to that location, where he found the victim's car and cell phone abandoned near the parking lot of the Lindale Apartments. *Id.* at 47, 56. *Id.* The Lindale Apartments are within two blocks of the robbery site. *See* ECF 28-9. The officer contacted the manager of the apartment complex. ECF 23-1 at 47. After Officer Bragg described the suspects, the manager told him that she saw juveniles matching that description walking away from the victim's car earlier that day. *Id.* The manager added that she did not believe that the juveniles lived in the Lindale Apartments. *Id.* She also promised to call the police if she saw the juveniles again. *Id.*

Two hours later, the manager saw the three juveniles again and called 9-1-1. *Id.* Upon connecting with the operator, the manager said that "the three girls are in our parking lot again." ECF 31-4 ("Call") at 0:00:47-0:00:57; *see also id.* The manager told the operator that the juveniles did not live at any apartments nearby. *Id.* at 0:00:57-0:01:01. The operator asked for a description of the juveniles. *Id.* at 01:01-03. The manager said she was afraid to go outside. *Id.* at 01:03-06. The operator then asked the manager how she knew the juveniles were involved with the car robbery. The manager told the operator that she spoke with an officer who described the suspects as three Black teenage girls. *See id.* at 01:07-20. She explained that a maintenance worker at the apartment complex just saw three girls fitting that description. *Id.* at 0:01:20-30. The girls stopped and asked the worker for a cigarette when they were running down the road. *Id.*

PAGE 4 – ORDER ON MOTION TO SUPPRESS EVIDENCE

The operator asked where the juveniles were now, and the manager explained that they were standing directly in the center of the parking lot and "look[ed] like they were looking for a car to steal." *Id.* at 0:01:30-:51. The operator then asked whether the maintenance worker could provide a description beyond the race and sex of the juveniles. The manager sent the worker a message. *Id.* at 01:51-3:00. As the manager read the maintenance worker's response to the operator, she was interrupted by another text message: "Three Black young women and one Black male, male has a red shirt, black coat, and—oh, and he says they're leaving the parking lot." *Id.* at 0:03:30-:45. The manager then confirmed that the four were all walking together. *Id.* at 0:05:05-:10. She continued to describe the group's whereabouts to the operator as they walked into the parking lot of the Pheasant Park Apartment Complex. *Id.* at 0:05:30-6:00. The manager also told the operator that one of the juveniles had a bun on top of her head, and one of the juveniles had "something yellow on top of her head." ECF 23-1, Ex. 5 at 1.

Police Officers Auxer and Andrews arrived in one patrol car and Officer Bragg arrived in another. They saw the three juveniles and the adult male—who would later be identified as the Defendant, Mr. Kerney—walking together. When the group of four saw the officers, they split up. At 12:46 p.m., Officer Bragg apprehended two of the juveniles. *See* Gov't Ex. 12. One was wearing a yellow silk bonnet and the other a black puffer jacket with the hood up. *Id.* The juvenile wearing a yellow bonnet was holding a cell phone. *Id.* at 12:46:33. Also around 12:46 p.m., Officer Auxer got out of his patrol car and stopped Mr. Kerney on foot, saying, "Hey stop. Stop right there. Don't go anywhere." ECF 23-1, Ex. 1 ("Auxer Bodycam"). Mr. Kerney was wearing a red shirt and a black coat. Officer Andrews joined Officer Auxer and Mr. Kerney on the sidewalk. At this point, Officers Auxer and Andrews began questioning Mr. Kerney, while Officer Bragg and another officer began questioning the two juveniles. The officers

PAGE 5 – ORDER ON MOTION TO SUPPRESS EVIDENCE

communicated intermittently over their radio systems, but they kept Mr. Kerney physically separated from the juveniles. *See, e.g.*, ECF 53 at 9:1-3.

Officer Auxer told Mr. Kerney to "stay here until we get everything figured out" and then asked Mr. Kerney if he knew "the girls [he] was just with." *Id.* at 12:46:11. Mr. Kerney said that he had just met them and that one of the girls asked him if she could use his phone. *Id.* at 12:46:22; 12:46:43. Officers Auxer and Andrews asked Mr. Kerney to identify himself. At first, Mr. Kerney did not answer. Then, Mr. Kerney told the officers that his name was Jaron. *Id.* at 12:46:39. When the officers asked Mr. Kerney for his full name, he gave and spelled the name "Jaron Lamont Weeks." *Id.* at 12:47:29-45. Mr. Kerney also said his date of birth was March 9, 1987. *Id.* The officers ran that name and date of birth through a police database. While the officers were waiting for the results, Mr. Kerney told the officers that he didn't have anything to do with the girls and that he would call his lawyer. Officer Andrews told Mr. Kerney that this was "just a stop," that there was high traffic on the radios, and the officers wanted to get his identity "ran" and "get him out of here." *Id.* at 12:48:50. Mr. Kerney repeatedly stated he had "nothing to do with this" and that he didn't know the juveniles. *See id.*

Around 12:51 p.m., Mr. Kerney asked if he was being held for anything and again stated that he needed to call his lawyer and didn't feel comfortable being held against his will. *Id.* at 12:51:00-40. The officers said that they needed to "run" Mr. Kerney to see if he had "any warrants or anything." *Id.* at 12:51:40-48. The officers then confirmed that they were holding Mr. Kerney until they "absolve [him] of any connection with [the three juveniles] before a few minutes ago." *Id.* at 12:52:30-53:00. The officers then asked Mr. Kerney if he had any identification on him to corroborate his identity. *See id.* at 12:53:55. Mr. Kerney said that he did not. *Id.*

PAGE 6 – ORDER ON MOTION TO SUPPRESS EVIDENCE

The police database search turned up no outstanding warrants for the name "Jaron Weeks." Officer Andrews then told Officer Auxer "he's negative," and walked over to Officer Bragg to ask if Officer Bragg had any reason to continue to hold Mr. Kerney. Officer Bragg said no. Officer Andrews asked the same question to other officers and dispatch on his radio. Within a minute, dispatch directed Officer Andrews to switch his radio from channel one—which had high traffic because officers were still looking for the third juvenile—to channel two. The dispatcher then told Officer Andrews that "Jaron Weeks" is the name of a deceased person. ECF 28-3. Officer Andrews walked back to Mr. Kerney and told him that officers were having trouble identifying him by the name Jaron Weeks, asked him if he used any other names, and told Mr. Kerney, "that's what's holding us up right now—we just want to make sure we know who we're talking to." Auxer Bodycam at 12:54:15-:20. Mr. Kerney said he did not use any other names. *Id.* at 12:54:25. Mr. Kerney asked if he could call his lawyer, and officers told him that he was welcome to call whoever he wanted. *Id.* at 12:54:58.

At 12:55:38, about a minute-and-a-half after learning that Mr. Kerney had lied about his identity, Officer Andrews handcuffed Mr. Kerney. Officer Andrews told Mr. Kerney he was being "detained" until they could figure out who he is and read Mr. Kerney his *Miranda* rights. *Id.* at 12:55:55-56:20. While being read his rights, Mr. Kerney shouted to two of the juveniles and said that he wanted to "give them a number to call." *Id.* at 12:56:37. Officer Andrews patted down Mr. Kerney. *See id.* Officer Andrews felt a hard object in Mr. Kerney's pocket—what he believed to be bullets of the size that go into a handgun—and an object in Mr. Kerney's back pocket consistent with a wallet. Officer Andrews checked the wallet for small weapons, such as razor blades. When he did so, Mr. Kerney's identification card was in plain view. The officers placed Mr. Kerney in their squad car around 12:59 p.m. *Id.* at 12:59. They then ran Mr. Kerney's

PAGE 7 – ORDER ON MOTION TO SUPPRESS EVIDENCE

real name through their database and learned that he had an outstanding federal arrest warrant, alleging violations of the terms of his federal supervised release. The officers then "arrested" Mr. Kerney under the supervised release violation arrest warrant. The entire interaction between Mr. Kerney and officers lasted about twenty minutes.

While Officers Andrew and Auxer questioned Mr. Kerney, Officer Bragg questioned the two juveniles. *See* ECF 49, Ex. 8 ("Bragg Bodycam"); ECF 53, Ex. 9 ("Bragg Transcript"). At around 12:46 p.m., one of the juveniles said, "I don't know this man that you all are talking about." ECF 49 at 12:47:43; ECF 53 at 4:7-8. Then, the juveniles each explained to Officer Bragg their involvement in the robbery. Neither described Mr. Kerney or any man being present at the scene. Around 12:56 p.m., however, one of the juveniles suggested that there were more than three assailants present. She said: "I wasn't the one that was in with the car. Me and my cousin left. The other people that were there, they have something to do with that." ECF 49 at 12:56:18; ECF 53 at 12:18-20. Officer Bragg then asked, "So, how many of you—of there were you?" and the juvenile clarified "Four." ECF 49 at 12:56:29-35; ECF 53 at 13:3-7. At 1:05 p.m., the two juveniles confirmed that Mr. Kerney was their "big cousin." ECF 49 at 13:05:02-15; ECF 53 at 22:10-23:3.

## DISCUSSION

When the police officers stopped Mr. Kerney on the sidewalk, they "seized" him, as that term is used in the Fourth Amendment context. With "a show of authority," the officers restricted Mr. Kerney's liberty by telling him to stop and reiterating that they needed to confirm Mr. Kerney's identity. *See Washington*, 387 F.3d at 1068. A reasonable person in Mr. Kerney's position would not have believed that he was free to leave. *See Mendenhall*, 446 U.S. at 545. The evidence obtained from the search must therefore be suppressed unless the government can demonstrate that its warrantless search was constitutional, *see Scott*, 705 F.3d at 416, or that the

PAGE 8 – ORDER ON MOTION TO SUPPRESS EVIDENCE

inevitable discovery doctrine applies, *Nix*, 467 U.S. at 444. The government argues that it properly performed a *Terry* stop for which a warrant is not required. The Court agrees. As explained below, Mr. Kerney's motion fails because the stop and related search were lawful.

Considering the totality of the circumstances, *see Cortez*, 449 U.S. at 417, when they stopped Mr. Kerney outside the Lindale Apartments, Officers Auxer and Andrews had reasonable suspicion that Mr. Kerney may have been involved in the robbery that occurred earlier that morning. At the time of the stop, the officers already knew that: (1) three female, Black juveniles violently attacked the victim at about 9:00 a.m. that morning and stole her car and cell phone; (2) officers located the stolen car and cell phone at about 10:30 a.m. across the street from the Lindale Apartments; (3) the Lindale Apartments are within two blocks of the robbery site; (4) the apartment manager saw three female, Black juveniles that morning; (5) at about 12:30 p.m., the apartment manager saw the same three juveniles at the Lindale Apartments, now accompanied by an adult Black male; (6) the group was walking together and appeared as though they were looking for a car to steal; (7) the adult Black male was wearing a red shirt and a black coat; (8) one of the juveniles had something yellow on her head; and (9) the adult Black male appeared to be significantly older than the three teenagers.

Taken together, this information gave the officers a "particularized and objective basis" to stop and question Mr. Kerney, who was wearing a red shirt and black coat and who was observed walking and conversing with three Black female juveniles, one of whom was wearing a yellow silk bonnet. *See Arvizu*, 534 U.S. at 273. The officers were justified in considering the apartment manager's tip to be reliable, because the officers corroborated that eyewitness account immediately upon arriving on the scene. *See Alabama v. White*, 496 U.S. 325, 332 (1990) (holding an anonymous tip that was independently corroborated by police work may exhibit

PAGE 9 – ORDER ON MOTION TO SUPPRESS EVIDENCE

sufficient indicia of reliability to justify a *Terry* stop). Thus, the officers were justified in relying on the apartment manager's report that Mr. Kerney and the three juveniles looked like they were looking to steal another car. In addition to that reliable tip, Mr. Kerney was seen with the three female juveniles close to the crime scene, and within a block of where the stolen car and cell phone were recovered after the robbery. *See United States v. Gallinger*, 227 F. Supp. 3d 1163, 1169 (D. Idaho 2017) (collecting cases for the proposition that a suspect's proximity to a crime scene is a factor supporting a finding of reasonable suspicion); *but see Gallinger*, 227 F. Supp. 3d at 1169 (holding proximity *alone* is insufficient and "[s]omething more is necessary to raise suspicion that a person is the one engaged in wrongdoing").

Mr. Kerney argues that the officers had no reason to suspect that he was involved in the robbery or assault that occurred earlier that morning because the victim did not describe a male being present during the assault. That argument, however, begins with a flawed premise. The victim may not have described a fourth assailant because she was jumped and brutally beaten. It is reasonable to assume that she might not have seen a fourth assailant or forgot the details of the attack in the heat of the moment. Thus, the victim not reporting a male attacker does not foreclose reasonable suspicion. *Cf. United States v. Arteaga*, 2022 WL 17095905, at *9 (N.D. Cal. Nov. 21, 2022) (holding officers were justified in performing a *Terry* stop when the detainee was a different race than crime suspect and "the officers would have been justified in detaining *anyone* who appeared to be connected" to the crime scene (emphasis in original)).

Mr. Kerney also argues that officers stopped him for his mere association with the three juveniles. Although "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybarra v.*

PAGE 10 – ORDER ON MOTION TO SUPPRESS EVIDENCE

*Illinois*, 444 U.S. 85, 91 (1979), there is more here.[1] As previously noted, Mr. Kerney was observed speaking with the juveniles. It is therefore reasonable to assume that he might have had a preexisting relationship with them. Further, Mr. Kerney was noticeably older than the teenage juveniles. Officers are entitled to "draw on their own experience and specialized training" in forming reasonable suspicion. *Arvizu*, 534 U.S. at 273. The age gap "suggested a possible managing or controlling dynamic" between Mr. Kerney and the three juveniles, thereby bolstering the officers' reasonable suspicion beyond mere association. *See* ECF 29 at 11.

Mr. Kerney further argues that, even if there were reasonable suspicion, it "dissipated" during the stop because the two juveniles who were apprehended "admitted their own involvement in the assault and robbery to Officer Bragg, and, in doing so, they did not implicate Mr. Kerney." ECF 22 at 15. The fact that one suspect has not yet implicated another suspect, however, does not eliminate reasonable suspicion as to the other suspect. That is particularly true where, as here, the detainee's behavior during a *Terry* stop heightens reasonable suspicion.[2]

---

[1] Even if the officers stopped Mr. Kerney because of their "mere subjective impressions" of the situation, *see* ECF 22 at 13 (quotation omitted), the Ninth Circuit has made clear that officers' "subjective motivations, whatever they may have been, [do] not change the objective reasonableness of [their] actions," *United States v. Steinman*, 159 F.4th 550, 563 (9th Cir. 2025) (quoting *United States v. Taylor*, 60 F.4th 1233, 1240 (9th Cir. 2023)).

[2] The government argues that Officer Andrews and Auxer's reasonable suspicion was also raised based on the observations of Officer Bragg under the collective knowledge doctrine. When officers are working together in an investigation, and there is some "communication among agents," the Court applies the collective knowledge doctrine. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (quoting *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990)). Under that doctrine, the Court "determine[s] whether an investigatory stop, search, or arrest complied with the Fourth Amendment by 'look[ing] to the collective knowledge of all the officers involved in the criminal investigation.'" *Id.* (second alteration in original) (quoting *United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir. 1986)). A court may aggregate all the officers' knowledge "regardless of whether any *information* giving rise to probable cause was actually communicated to the officer conducting the stop, search, or arrest." *Id.* (cleaned up) (emphasis in original); *see also United States v. Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980) (applying collective knowledge doctrine "even though some of the critical information had not been communicated to" arresting officer). The only "limited requirement" for the doctrine to

PAGE 11 – ORDER ON MOTION TO SUPPRESS EVIDENCE

Even if the initial stop was lawful (which Mr. Kerney maintains it was not),[3] Mr. Kerney argues that the officers unlawfully prolonged the stop. *See* ECF 33 at 12-14 (citing *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019)). In *Landeros*, the Ninth Circuit assumed that an officer was permitted to prolong an initially lawful traffic stop to ask two women for identification because the officer had reasonable suspicion that the women were underage. 913 F.3d at 867-68. When the women refused to provide identification, the officer performed "several minutes of additional questioning to ascertain [the defendant's] identity." *Id.* Because "an officer may not lawfully order a person to identify herself absent particularized suspicion that she has engaged, is engaging, or is about to engage in criminal activity," and the officer had none, *id.* at 870, the court held that the officer unlawfully prolonged the stop. Mr. Kerney argues that "Officer Andrews' continued unlawful demand for his identification" unconstitutionally

---

apply is that "there be a communication but not necessarily the conveyance of any actual information among officers." *Ramirez*, 473 F.3d at 1032-33.

The three officers communicated during their stops, so the collective knowledge doctrine applies. Around 12:46 p.m., Mr. Kerney told Officers Auxer and Andrews that he had never met the juveniles before and that he was only speaking to the juveniles because they asked Mr. Kerney if they could use his cell phone. At the same time, however, Officer Bragg apprehended the juvenile in the yellow bonnet while she was holding her cell phone. The government argues that Mr. Kerney's statement, paired with Officer Bragg's observations, only heightened the officers' reasonable suspicion that Mr. Kerney was not being truthful.

Mr. Kerney argues that his statement is not inconsistent with the fact of one of the juveniles carrying a cell phone—the juvenile's cell phone could have been out of battery, for example, or broken during that morning's fight. He also argues that there is no contemporaneous evidence that any of the officers were skeptical of the cell phone details, and that the government's argument is a *post hoc* rationalization. Finding Mr. Kerney's arguments persuasive, the Court gives little weight to the officers' "collective knowledge" of the cell phones.

[3] Mr. Kerney also cites *Brown v. Texas*, 443 U.S. 47 (1979), for the proposition that "[a]n officer may not demand that a person disclose their identity unless the person is lawfully stopped." Because the Court concludes that the initial stop was lawful, it need not address this argument.

prolonged the stop. Officer Andrews did not delay the stop to demand identification from Mr. Kerney. After Mr. Kerney first gave officers the name "Jaron Weeks," the officers communicated over radio that they obtained Mr. Kerney's identification. ECF 53 at 9:1-3 ("Did we ID him?" "Yeah."). When Mr. Kerney later said that he didn't have a physical ID card on him, the officers did not press the issue further.

This case is more like *Steinman*, in which the Ninth Circuit held that an officer does not prolong a *Terry* stop while waiting for the results of a justified criminal history check. *United States v. Steinman*, 159 F.4th 550, 563-66 (9th Cir. 2025). Upon receiving the name "Jaron Weeks," Officers Auxer and Andrews immediately began processing a criminal background check in their police database for Mr. Kerney. *See* Auxer Bodycam at 12:51:40-48 (officers saying they need to "run" Mr. Kerney to see if he had "any warrants or anything"). The officer in *Steinman* also ran a background check during a *Terry* stop. 159 F.4th at 563-66. There, the Ninth Circuit court explained that running a criminal history check "is a negligibly burdensome precaution required for officer safety." *Id.* at 565 (quotation omitted). Because the background check was within the scope of the *Terry* stop, the officer's asking questions while waiting for the results of that check "did not measurably extend the duration of the traffic stop," and thus, did not unlawfully prolong it. *Id.* at 564, 566; *see also United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) ("[W]e join our sister circuits and hold that because a criminal history check stems from the mission of the stop itself, it is a negligibly burdensome precaution necessary to complete the stop safely." (cleaned up)).

Here, Officers Auxer and Andrews' running a background check was "objectively reasonable" because "a reasonable officer would have believed it to be justified by officer safety." *See Steinman*, 159 F.4th at 565. A background check reveals to officers any outstanding

PAGE 13 – ORDER ON MOTION TO SUPPRESS EVIDENCE

warrants, alerts, or warnings related to a suspect's past behavior, which might change how an officer interacts with that suspect. As Officer Andrews testified, for example, a weapons-related charge on a background check would inform officers of the need to instruct a suspect to sit on the curb or the hood of the patrol car instead of standing with officers. The check was particularly justified for officer safety in this situation because the robbery was violent and Officers Auxer and Andrews had reasonable suspicion to believe that Mr. Kerney could be involved. When they stopped Mr. Kerney, the officers already knew the extent of the victim's injuries, including a bloody fat lip, pain to her head, a skinned knee, and a limp. Knowing of these violent injuries, it was reasonable for Officers Auxer and Andrews to run a background check on Mr. Kerney. Thus, the *Terry* stop was not unlawfully prolonged while the officers awaited the results of the background check. Indeed, from the initial stop of Mr. Kerney to his arrest, the interaction lasted less than twenty minutes. *See United States v. Sharpe*, 470 U.S. 675, 687-88 (1985) (holding 20-minute detention, delayed almost entirely because of the evasive actions of a detainee, was reasonable).

Temporarily handcuffing and frisking Mr. Kerney was also justified for officer safety. A reasonably prudent officer, upon learning that Mr. Kerney had given a false identification for the background check, would be warranted in the belief that Mr. Kerney was involved in the violent robbery. Mr. Kerney was "behaving suspiciously and giving apparently false information," after Officer Andrews "received a report" from dispatch about his given identity, Jaron Weeks. *See United States v. Bernal*, 2013 WL 2475622, at *4 (D. Ariz. June 7, 2013). Thus, "handcuffing [Mr. Kerney] . . . while he completed a *Terry* stop investigation was not unreasonable." *See id.* (denying suppression motion), *aff'd mem.*, 599 F. App'x 694, 695 (9th Cir. 2015) (unpublished) ("Bernal is wrong that the officer violated the Fourth Amendment by

detaining him when the officer did not know whether Bernal was the driver. The officer had cause to detain and question all of the men connected to the SUV."). Further, although the officers had no confirmation that weapons were involved in the robbery, a reasonably prudent officer would believe that Mr. Kerney could be armed and presently dangerous given the victim's severe injuries and Mr. Kerney's use of a false identity. *See Brown*, 996 F.3d at 1007.

The physical evidence obtained from the frisk also need not be suppressed. When Officer Andrews felt what he reasonably believed to be a bullet (ammunition) during his frisk, he was justified in seizing that ammunition. *See United States v. McNeil*, 2001 WL 34043517, at *7 (D. Or. Mar. 22, 2001) ("This court concludes that it is reasonable for an officer to conduct a pat-down during a stop that arose out of a reasonable suspicion regarding robbery, and that the subsequent seizure of the bullets was proper."). Officer Andrews also removed Mr. Kerney's wallet from his back pocket during his frisk of Mr. Kerney. The government argues that this was justified because Mr. Kerney's wallet could have contained a weapon, such as a razor blade. Unlike the seized bullets, Officer Andrews does not argue that he could tell, by plain feel, that there were weapons in Mr. Kerney's back pocket. Nor is there any reasonable evidence that a razor blade or other small, flat weapon was used in the robbery. The government argues, however, that the mere identity of a defendant can never be suppressed. The Court agrees. *See United States v. Del Toro Gudino*, 376 F.3d 997, 1000-1002 (9th Cir. 2004). Thus, the Court need not reach the issue of whether Officer Andrews was justified in removing Mr. Kerney's wallet from his back pocket.[4]

---

[4] The Court also need not reach Mr. Kerney's argument that his federal supervised release warrant did not sufficiently attenuate the stop because Officers Auxer and Andrews were not required by law to arrest Mr. Kerney on that warrant. *See* ECF 48 at 5 (citing *Utah v. Strieff*, 579 U.S. 232 (2016)). The Court concludes that the stop was lawful.

## CONCLUSION

The Court DENIES Defendant's Motion to Suppress. ECF 22.

**IT IS SO ORDERED.**

DATED this 23rd day of December, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

The Court also declines to reach the government's argument that the juveniles' statements to Officer Bragg contributed to Officer Andrews and Auxer's reasonable suspicion under the collective knowledge doctrine. Mr. Kerney argues that these statements are irrelevant because they were made after he was placed in handcuffs and searched. He also argues that because these statements did not raise Officer *Bragg*'s reasonable suspicion at the time of the arrest, they could not raise Officers Auxer and Andrews' reasonable suspicion under the collective knowledge doctrine. Because Officers Auxer and Andrews had reasonable suspicion without considering the juveniles' statements, the Court does not discuss these arguments further.

PAGE 16 – ORDER ON MOTION TO SUPPRESS EVIDENCE